IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINA PRESLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 3:12-CV-374-WKW |
| | ) | [WO] |
| JAMES P. GRAHAM, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christina Presley, a former city police officer, brings this action against the City of Phenix City, Alabama ("City"), and City Attorney James P. Graham, Jr., alleging a First Amendment retaliation claim under 42 U.S.C. § 1983 and related state-law claims.  Before the court are Defendants' Rule 12(b)(6) motions to dismiss.  (Docs. # 7, 9); Fed. R. Civ. P. 12(b)(6).  Ms. Presley filed a response (Doc. # 15), and Mr. Graham filed a reply brief (Doc. # 17).  For the reasons to follow, the court finds that the motions are due to be denied.

## I. JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

In ruling on a Rule 12(b)(6) motion to dismiss, the court "must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *Paradise Divers, Inc. v. Upmal*, 402 F.3d 1087, 1089 (11th Cir. 2005) (citation and internal quotation marks omitted).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

Moreover, while generally the "'scope of the review must be limited to the four corners of the complaint'" in Rule 12(b)(6) proceedings, *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)), there are exceptions to this general rule.  Two such exceptions are relevant in this case.  First, in addition to considering the properly pleaded allegations of the complaint, a court can consider "an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."  *Id.*  Second, a court can

take "judicial notice of its own records." *ITT Rayonier Inc. v. United States*, 651 F.2d

343, 345 n.2 (5th Cir. 1981); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 322 (2007) (A court may consider "matters of which [it] may take

judicial notice."); *see also* Fed. R. Evid. 201 (governing judicial notice of

adjudicative facts).

## III.  FACTS

This federal lawsuit arises out of Ms. Presley's settlement of another federal

lawsuit. *See Presley v. City of Phenix City*, No. 3:10cv821 (M.D. Ala., filed Sept. 29,

2010) ("*Presley I*").  The facts are best understood in light of the proceedings

underlying *Presley I*, and that is where the court begins.[1]

Ms. Presley began her career as an officer with the Phenix City police

department in 1997.  Fast forward twelve years to 2009, and Ms. Presley, who then

worked as a criminal investigator, scored one of the top grades on a written

promotional exam.  That score earned Ms. Presley a promotion to sergeant.  Before

the promotion took effect, however, Ms. Presley engaged in conduct that her

superiors deemed insubordination.  In short, Ms. Presley refused her superior's

directive to arrest a suspect because she believed the suspect had acted in self defense

---

[1] Judicial notice is taken of the proceedings in *Presley I*.

when he cut the alleged victim during an altercation.  As a result of her decision, Ms. Presley lost her promotion and gained a three-day suspension.

Ms. Presley responded by filing *Presley I*, an employment discrimination lawsuit against the City, its police chief, and one of its police officers.  She alleged gender discrimination on failure-to-promote and discriminatory-discipline grounds, contending that the police department treated similarly situated male officers more favorably in violation of federal law.  Mr. Graham represented the defendants in that lawsuit.  After the court denied the defendants' summary judgment motion, but before trial, Ms. Presley and the defendants entered into a written settlement agreement that resulted in the dismissal of her lawsuit.[2]  The agreement's terms provided for payment of a substantial monetary sum to Ms. Presley and Ms. Presley's permanent resignation from the police department.   The agreement also contained a "confidentiality of settlement" clause, which provided, in pertinent part:

> Neither Plaintiff nor Defendants, their attorneys, or any person acting by, through, under or in concert with Plaintiff of [sic] Defendants, shall disclose any of the terms of the settlement to any individual or entity. If either the Defendants or Plaintiff is asked a question regarding the Lawsuit or this Agreement, all agree that they shall limit their remarks

---

[2] The court may consider the settlement agreement without converting the Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment because it satisfies *Speaker*'s requirements.  *See* 623 F.3d at 1379.  Namely, the Complaint refers to the settlement agreement; the settlement agreement is central to Ms. Presley's claims; and Defendants do not contest the document's authenticity.  *See id.*  Additionally, Defendants interpose no objection to the court's consideration of the settlement agreement.

4

to saying simply that the matter has been settled or resolved to their satisfaction or the satisfaction of all parties.

(Settlement Agreement, at 3 ¶ 2; Compl. ¶ 10.)

Five days after the parties finalized the settlement agreement, a local newspaper reporter, who had been reporting on the lawsuit since its inception, contacted Mr. Graham. Mr. Graham divulged the monetary amount of the settlement, the division of the money between Ms. Presley and her attorney, and the fact that Ms. Presley's resignation was a term of the settlement. The reporter then wrote an article about the settlement that ran locally and through national wire services. That article divulged the settlement terms as relayed by Mr. Graham and also quoted Mr. Graham as calling Ms. Presley a "supervisor's nightmare." (Compl. ¶ 16.)

This lawsuit followed. Ms. Presley's Complaint contains four causes of action and names the City and Mr. Graham. Count I alleges a 42 U.S.C. § 1983 First Amendment retaliation claim against Mr. Graham in his individual capacity. Counts II, III, and IV allege state-law causes of action against both Defendants for defamation, breach of contract, and fraud in the inducement.

## IV.  DISCUSSION

Defendants filed separate motions to dismiss.  The court first addresses Mr. Graham's motion and then the City's.  For the reasons to follow, both are due to be denied.

## A.  **Mr. Graham's Motion to Dismiss**

### *1.     § 1983 First Amendment Retaliation Claim*

In Count I, Ms. Presley alleges that Mr. Graham retaliated against her in violation of her rights to freedom of speech and to petition for the redress of grievances under the First Amendment.  She avers that *Presley I* constitutes protected speech and a petition for redress of grievances, and that Mr. Graham retaliated against her for having filed *Presley I* by breaching the settlement agreement that had resolved it.

### a.     **Individual Liability**

Mr. Graham's first argument for dismissal boldly attempts to turn § 1983 on its head by insisting on dismissal because Ms. Presley accuses him of acting "under color of law."  (Doc. # 7, at 3.)  But a cursory glance at the text of § 1983 reveals how that argument is flawed:  Section 1983 provides for individual liability *only* against those who act under color of state law.  *See* 42 U.S.C. § 1983 (providing for liability against individuals who act "under color of any statute, ordinance, regulation, custom,

or usage, of any State"). The Complaint's allegation that Mr. Graham acted under color of law states an essential element of Ms. Presley's § 1983 claim; it does not provide a proper basis for dismissal.

### b.    The Elements of a First Amendment Retaliation Claim

"The right to petition the courts for redress implicates the First Amendment right of free speech and right to petition the government." *The Real Estate Bar Assoc. for Mass., Inc. v. Nat'l Real Estate Info. Servs.*, 608 F.3d 110, 124 (1st Cir. 2010). To survive Rule 12(b)(6) scrutiny, a plaintiff alleging "retaliation for exercising rights protected by the First Amendment must allege 'first, that his [or her] speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech.'" *Abella v. Simon*, 482 F. App'x 522, 523 (11th Cir. 2012) (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)). Mr. Graham challenges the first and second elements.

### i.    The Public Concern Element

As the court understands Mr. Graham's argument with respect to element one, whether the retaliation claim is analyzed under the First Amendment's Speech Clause or the Petition Clause, *Presley I* must relate to a matter of public concern to warrant

7

constitutional protection.   In support of his argument, Mr. Graham cites First Amendment speech cases in the public-employment context, such as *Brown v. School Board of Orange Cnty.*, 459 F. App'x 817 (11th Cir. 2012), and *Williams v. Gwinnett County Public Schools*, 425 F. App'x 787 (11th Cir. 2012), for the proposition that an employee's personal grievance is not speech that touches on a matter of public concern.   (Doc. # 7, at 6.)   And, although not cited by Mr. Graham, the Supreme Court of the United States in *Borough of Duryea v. Guarnieri*, ___ U.S. ___, 131 S. Ct. 2488 (2011), held that the "public concern" test also applies to public employees who bring First Amendment Petition Clause claims.[3]   If Mr. Graham is correct, then the framework established in *Connick v. Myers*, 461 U.S. 138 (1983), and *Pickering v. Board of Education*, 391 U.S. 563 (1968), for analyzing a public employee's First Amendment speech claims would apply to Ms. Presley's First Amendment retaliation claims.   *See Guarnieri*, 131 S. Ct. at 2500 (extending *Connick-Pickering* analysis to a public employee's Petition Clause claims); *see also Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) ("It was well settled by the Supreme Court in *Connick* and *Pickering* that, for a government employee's speech to have First Amendment

---

[3] In so holding, the Supreme Court rejected circuit precedent that "a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the Petition Clause from retaliation for that activity, even if the petition concerns a matter of solely private concern."   *Guarnieri v. Duryea Borough*, 441 F. App'x 74, 75 (3d Cir. 2011) (citation and internal quotation marks omitted).

8

protection, the employee must have (1) spoken as a citizen and (2) addressed matters of public concern.").

Ms. Presley counters, however, that the public concern test of *Connick-Pickering* and *Guarnieri* is not applicable. She argues that her First Amendment retaliation claim falls outside the public-employment context because she was no longer a City employee when Mr. Graham allegedly retaliated against her. Ms. Presley also cites *Guarnieri*, not for its holding, but for its observation that, "[o]utside the public employment context, constitutional protection for petitions does not necessarily turn on whether those petitions relate to a matter of public concern." 131 S. Ct. at 2498.

The issue of whether Ms. Presley's lawsuit amounts to speech or petitioning activities by a "citizen," rather than by a "public employee," is an important one.[4] Whether the *Connick-Pickering* line of cases provides the analytical framework is not

---

[4] *See generally Pickering*, 391 U.S. at 568 (recognizing that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general"); *see also L.L. Nelson Enters. v. Cnty. of St. Louis*, 673 F.3d 799, 808 (8th Cir. 2012) ("[W]here the complainant's relationship with the government is not analogous to that of employee-employer, and the government acts as sovereign rather than as an employer or contractor in taking the alleged retaliatory action, then the complainant's First Amendment claim is not limited by the public concern test."); *accord Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008).

immediately clear, however.[5] There is, fortunately, a simpler ground for resolving the present motion because the facts, viewed in the light most favorable to Ms. Presley, plausibly allege protected conduct sufficient for a First Amendment retaliation claim even under the stricter public concern test.

"[S]peech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (quoting *Connick*, 461 U.S. at 146). This inquiry focuses on the "content, form, and context of the speech." *Id.* (citation and internal quotation marks omitted); *see also Guarnieri*, 131 S. Ct. at 2501 ("As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context of [the petition], as revealed by the whole record.'" (quoting *Connick*, 461 U.S. at 147–48

---

[5] Notably, there are some potentially relevant issues that the parties have not addressed. For example, although Ms. Presley was a private citizen when Mr. Graham allegedly retaliated against her, she was a government employee when she filed her first federal lawsuit. The parties have not analyzed whether Ms. Presley's status is determined at the time she engaged in the speech and petitioning activities or at the time she suffered retaliation. These facts distinguish this case from those cited by both Ms. Presley and Mr. Graham. In the cases cited by Mr. Graham, the plaintiffs were public employees both at the time of their speech and at the time of the retaliation. And in *Powell v. Alexander*, 391 F.3d 1 (1st Cir. 2004), the principle case upon which Ms. Presley relies, the plaintiff was a private citizen, unlike Ms. Presley, when he filed his discriminatory termination lawsuit (*i.e.*, the petitioning activity). *See id.* at 6. The parties also have not addressed how, if at all, the contractual relationship between Ms. Presley and her former employer affects the private/public citizen dichotomy.

& n.7)).  Whether something is a matter of public concern is a question of law for the court.  *See Connick*, 461 U.S. at 148 n.7.

Mr. Graham argues that Ms. Presley's discrimination lawsuit is tantamount to the speech at issue in *Brown*, 459 F. App'x at 817, and *Williams*, 425 F. App'x at 787. In *Brown*, the employee complained about the storage, handling, and dangers of hazardous materials at his job site.  459 F. App'x at 820.  The speech did not warrant First Amendment protection because it related to the employee's job performance and "occurred in the workplace," rather than in "a public forum."  *Id.*  In *Williams*, the plaintiff-teacher, who had a deep hatred for dogs and "dog dander," sent a scathing and somewhat satirical e-mail to staff and faculty members criticizing a school program that required therapy dogs inside the school.  *See* 425 F. App'x at 788–89. The e-mail was not protected speech because its "title, tenor, and audience" focused on "matters only of personal interest."  *Id.* at 790.

Mr. Graham argues that, like the employees in *Brown* and *Williams*, Ms. Presley's first lawsuit, *Presley I*, amounts to a "personal grievance" about workplace gender discrimination.  (Doc. # 7, at 6.)  This argument touches on the "content" and "context" of *Presley I*.  Unquestionably, *Presley I* involved matters of personal interest to Ms. Presley.  The City had yanked her promotion and disciplined her, and she sought relief for those alleged wrongdoings.  But there also are sufficient facts

plausibly demonstrating that *Presley I* involved "more than a complaint about a change in the employee's own duties," *Guarnieri*, 131 S. Ct. at 2501, and implicated concerns broader in scope than "ordinary workplace grievances," *id.* at 2497.

*Presley I* challenged and sought to combat gender discrimination allegedly committed by supervisory officials charged with operating the City's police department.[6]   *See generally Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("Gender discrimination in employment is . . . a matter of public concern.").   *Presley I* further alleged that the discrimination Ms. Presley suffered was more than a discrete act; it resulted from an official custom or policy of illegal gender discrimination tainting police operations as a whole.   *See generally Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir. 1988) ("[T]he disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." (internal footnote omitted)).   These allegations suggest not just isolated discriminatory acts against Ms. Presley, but also arguably systemic

---

[6] Mr. Graham has not argued, nor does the Complaint suggest, that *Presley I* was baseless.  To the contrary, Ms. Presley's gender discrimination claims survived summary judgment, and she obtained favorable terms as part of the settlement agreement, including a sizable monetary award.  The terms of the settlement agreement itself negate any argument that the lawsuit merely was a sham.  *See Powell*, 391 F.3d at 17 ("Given the substantial settlement obtained by the plaintiff . . . , any argument that the . . . lawsuit was baseless would be frivolous.").

wrongdoing that could adversely impact the public's perception of its local government officials. *Cf. Connick*, 461 U.S. at 148–49 (observing that the internal workplace speech "did not seek to . . . bring to light actual or potential wrongdoing or breach of public trust on the part of [the defendant] and others").

Additionally, on the topic of "context," the allegations reveal that *Presley I* attracted media attention. At least three articles concerning *Presley I* appeared in the Columbus *Ledger-Enquirer*. This coverage, even if only local in nature, lends support to a finding that Ms. Presley's lawsuit had a public interest component. Both the content and context of the speech weigh in Ms. Presley's favor.

This leaves consideration of the form of Ms. Presley's speech. The speech and petitioning activities that allegedly provoked the retaliation were in the form of a publicly filed federal lawsuit. This public form is markedly different from and more far reaching than the internal workplace complaint procedure at issue in *Brown* and the e-mail format at issue in *Williams*. *See Brown*, 459 F. App'x at 820; *Williams*, 425 F. App'x at 788–90. The form of the speech, therefore, also weighs in Ms. Presley's favor.

In sum, the allegations relevant to the content, form, and context of the speech and petitioning activities establish at this juncture that *Presley I* involved a matter of public concern. Mr. Graham's motion to dismiss on this ground is due to be denied.

## ii.  The Adverse Effect Element

Mr. Graham also contends that Ms. Presley cannot establish that the alleged retaliatory conduct adversely affected Ms. Presley's protected speech and petitioning activities. The gist of Mr. Graham's argument is that Ms. Presley did not suffer an adverse action because when the alleged retaliation occurred, Ms. Presley no longer worked in the public sector. This argument is not well taken.

Mr. Graham cites no authority that Ms. Presley's speech lost the protections of the First Amendment solely because she no longer had public employment that could be adversely affected. The court declines to graft a requirement into Ms. Presley's First Amendment retaliation claim that requires her to show that she was publicly employed when the retaliation occurred. *See Ranize v. Town of Lady Lake, Fla.*, No. 11cv646, 2012 WL 4856749, at *2 (M.D. Fla. Oct. 12, 2012) ("If the Court required an adverse *employment* action to prove a [First Amendment] retaliation claim, a private citizen punished by the government for exercising his or her First Amendment rights would never have standing to bring a claim." (emphasis and brackets added)); *cf. Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (observing that under the Age Discrimination in Employment Act, "plaintiffs may be able to state a claim for retaliation, even though they are no longer employed by the defendant company, if, for example, the company 'blacklists' the former employee, wrongfully

refuses to write a recommendation to prospective employers, or sullies the plaintiff's reputation." (internal citations omitted)).  As Mr. Graham urges no other grounds for dismissal, Mr. Graham's motion to dismiss the First Amendment retaliation claim is due be denied.

### 2.    *Defamation Claim*

Ms. Presley alleges that Mr. Graham defamed her when he told the news reporter that she was a "supervisor's nightmare," thereby casting a disparaging light on her professional character.  (Compl. ¶ 38.)  Under Alabama law, a claim for defamation requires "a false and defamatory statement concerning the plaintiff." *Skinner v. Bevans*, ___ So. 3d ___, 2012 WL 6634422, at *7 (Ala. Civ. App. 2012). Whether a statement "is reasonably capable of a defamatory meaning, in the first instance, is a question of law." *Finebaum v. Coulter*, 854 So. 2d 1120, 1128 (Ala. 2003) (citation and internal quotation marks omitted).  "[T]he test to be applied . . . in determining the defamatory nature of an imputation is that meaning which would be ascribed to the language by a reader or listener of ordinary or average intelligence, or by a common mind." *Id.* (citation and internal quotation marks omitted).

Mr. Graham argues that any statement that Ms. Presley was a "supervisor's nightmare" is not reasonably capable of a false or defamatory meaning, but instead

amounts to "rhetorical hyperbole" that "cannot be proven false." (Doc. # 7, at 7.) Mr. Graham's argument implicates First Amendment concerns.

Mr. Graham is correct that the First Amendment also plays a role in the state law defamation analysis with respect to the "'*type* of speech which may be the subject of state defamation actions.'" *Finebaum*, 854 So. 2d at 1125 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990)). "[A] defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of fact" or "'rhetorical hyperbole' that 'cannot reasonably be interpreted as stating actual facts about an individual.'" *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (quoting *Milkovich*, 497 U.S. at 20). Where there is rhetorical hyperbole, the language itself "negate[s] the impression that the writer was seriously maintaining that [the plaintiff] committed the [act described]." *Milkovich*, 497 U.S. at 21. The *Milkovich* Court also refused "to create a wholesale defamation exemption for anything that might be labeled 'opinion,'" reasoning that an expression of opinion also may imply knowledge of facts. *Id.* at 18.

Mr. Graham relies on *Horsley* as a comparable case, but the facts here are nothing like those in *Horsley*. There, on a cable news program, after the 1998 murder of a physician who performed abortions, Geraldo Rivera interviewed a pro-life activist who maintained a website listing personal information about individual

16

doctors who performed abortions.  During the interview, Mr. Rivera accused the activist of accomplice felony murder, and the activist sued for defamation.  The Eleventh Circuit held that the comment, made during "an emotional debate concerning emotionally-charged issues of significant public concern," was non-defamatory rhetorical hyperbole.  *Horsley*, 292 F.3d at 702.  "A reasonable viewer would have understood Rivera's comments merely as expressing his belief that [the activist] shared in the moral culpability for Dr. Slepian's death, not as a literal assertion that [the activist] had, by his actions, committed a felony."  *Id.*

Here, by contrast, construing the allegations in the light most favorable to Ms. Presley, the court cannot say as a matter of law that Mr. Graham's statement that Ms. Presley was a "supervisor's nightmare" is rhetorical hyperbole incapable of a demonstration of falsity.  This is true even if Mr. Graham's statement amounts to an opinion.  A reasonable reader could have concluded that Mr. Graham, as the police department's top legal advisor, had access to information about the specifics of Ms. Presley's job performance and that he based his opinion on his knowledge of these objective facts.  A reasonable reader could have reasoned, therefore, that Mr. Graham's opinion was a fact-based summation of Ms. Presley's on-the-job performance as a police officer.  *Cf. Synthes (USA) v. Globus Med., Inc.*, No. 04-1235, 2005 WL 2233441, at *3 (E.D. Pa. Sept. 14, 2005) (statement that one plaintiff

was "dangerous" and that another "will never work in [a given] hospital again" suggested that the speaker was "aware of undisclosed facts that may be defamatory").

Moreover, there are sufficient allegations plausibly suggesting that Ms. Presley "really had not" been a supervisor's nightmare. *Milkovich*, 497 U.S. at 20 n.7. For example, Ms. Presley alleges that the chief of police authored a general recommendation letter for her, stating that "[d]uring her time at the department, [Ms. Presley] was a competent and effective police officer." (Compl. ¶ 16.) When compared to the statement in *Horsley*, Mr. Graham's statement is "not the sort of loose, figurative, or hyperbolic language which would negate the impression that [Ms. Graham] was seriously maintaining" that Ms. Presley was a "supervisor's nightmare." *Milkovich*, 497 U.S. at 21.

The allegations are sufficient to overcome Mr. Graham's motion to dismiss. If appropriate, however, after discovery and further factual development, Mr. Graham can raise these issues again at summary judgment or trial.

### 3. *Breach-of-Contract Claim*

Count III alleges that Defendants breached the settlement agreement by "divulging the terms of the settlement, including that [Ms. Presley's] resignation was a condition of the settlement," and by labeling her as a "supervisor's nightmare." (Compl. ¶¶ 51, 52.) "The elements of a breach-of-contract claim under Alabama law

are (1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (citation and internal quotation marks omitted).

Mr. Graham's challenge is to the first element only.  He argues that there are no allegations on the "face of the Complaint" indicating that he was a party to the underlying settlement agreement; thus, he contends that Ms. Presley cannot hold him liable for an alleged breach of the agreement's confidentiality provision.  But, as previously noted, the settlement agreement is properly before the court, *see supra* note 2, and Mr. Graham has not objected to its consideration on Rule 12(b)(6) review. The settlement agreement expressly binds Ms. Presley, Defendants, and "*their attorneys*" to the terms of the confidentiality provision, and Mr. Graham was Defendants' attorney in *Presley I*.  (Settlement Agreement, at 3 ¶ 2.)  Based upon the settlement agreement's language, the court cannot conclude as a matter of law that Mr. Graham is not a party to that contract.  The motion to dismiss the breach-of-contract claim is due to be denied.

19

### 4.   *Fraud-in-the-Inducement Claim*

Count IV alleges that Defendants fraudulently induced Ms. Presley into entering the settlement agreement and resigning her employment by promising to "keep the terms of the settlement confidential," all the while knowing that they "had no intention" of doing so. (Compl. ¶¶ 56, 57.) Under Alabama law, "'[f]raud in the inducement consists of one party's misrepresenting a material fact concerning the subject matter of the underlying transaction and the other party's relying on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action.'" *Anderson v. Ashby*, 873 So. 2d 168, 182 (Ala. 2003) (quoting *Reynolds v. Mitchell*, 529 So. 2d 227 (Ala. 1988)).

Mr. Graham offers two arguments for dismissal of Count IV. First, he contends that, like the breach-of-contract claim, he is not liable on the fraudulent inducement claim because he was not a party to the settlement agreement. That argument fails for the reasons already stated. The second argument, that the claim does not satisfy the pleading requirements of *Twombly* and *Iqbal*, warrants little discussion. Contrary to Mr. Graham's arguments, the Complaint does more than simply recite the claim's elements. The specifics of Mr. Graham's alleged misconduct giving rise to this claim are sufficiently detailed. Accordingly, dismissal of the fraud-in-the-inducement claim is not appropriate.

**B.**   **The City's Motion to Dismiss**

Although the City is not named in Count I, it incorporates the arguments raised in Mr. Graham's motion to dismiss as to that count.  The City then argues that dismissal of Count I would leave the court "without jurisdiction over the supplemental or ancillary state law claims made as to the City." (Doc. # 9, at 1.)  This argument is not persuasive for the simple reason that Count I has survived Mr. Graham's motion to dismiss.  Even if it had not, the City's argument that the court would have no jurisdiction to hear the state law claims stops short of meaningful analysis.  The Complaint invokes this court's supplemental jurisdiction over the state law claims, *see* 28 U.S.C. § 1367(a), and the City fails to explain why § 1367(a)'s requirements are not met.  Because the City presents no viable basis for dismissal of the state law claims, its motion to dismiss is due to be denied.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that the motions to dismiss filed by Defendants City of Phenix City and City Attorney James P. Graham (Docs. # 7, 9) are DENIED.

DONE this 28th day of March, 2013.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
